[Filed February 29, 1892.]

## GIDEON F. HODSON v. J. C. GOODALE.

CONVERSION—CHATTELS SEVERED FROM REALTY—TITLE TO LAND—PAROL TESTIMONY.—In an action for the conversion of chattels, the ownership of which depends upon the fact that they have been severed from the land of plaintiff, the title to the land is only collateral to the main fact in dispute, and may be proven by parol.

CONFUSION OF GOODS—PARTITION OF CHATTELS.—Where the owners of different lots of logs voluntarily commingled them in a stream at a point where there is no market for them, and where they cannot be separated, it is necessarily an incident to the voluntary commingling that any one or more of the owners, upon notice to the others, may at the common expense of all in proportion to their holdings, move the logs to some point where separation may be conveniently possible.

Lane county: M. L. PIPES, Judge.

Defendant appeals.  Affirmed.

The complaint alleges in substance that the plaintiff was on the fourteenth day of March, 1890, the owner and in the possession in Lane county, Oregon, of 1,300,000 feet of good merchantable saw logs, branded as follows, to-wit, about 700,000 with the figure "7," and about 600,000 feet with the figure "2," and that said logs were of the value of $4.50 per thousand feet, and of the aggregate value of $5,850; that on said fourteenth day of March, 1890, defendant wrongfully and unlawfully, and without plaintiff's consent, took said logs into his possession in said Lane county and converted the same to his own use, to plaintiff's damage in the sum of $5,850; that on the twentieth day of March, 1890, plaintiff demanded possession of said logs from the defendant; that defendant claimed to be the owner thereof, and failed, neglected and refused to deliver the same or any part thereof to plaintiff, and still withholds the same from the plaintiff, to his damage in the sum of $5,850, with interest at the rate of eight per cent per annum since the fourteenth day of March, 1890.

The answer denies each material allegation of the com-

plaint, and then alleges certain matters in the nature of an estoppel *en pais.*

The reply denied the new matter in the answer.

A trial before a jury resulted in a verdict for the plaintiff in the sum of $2,080, on which judgment was duly entered, from which this appeal was taken. Thirty-four assignments of error are made in the notice of appeal, but only such as are necessary to a proper disposition of the cause will be noticed in the opinion.

*W. W. Thayer,* and *A. E. Gallagher,* for Appellant.

*L. Bilyeu,* and *Geo. A. Dorris,* for Respondent.

STRAHAN, C. J.—An objection was made in the court below and argued here upon an exception to the competency of the evidence offered on the part of the plaintiff to prove title to the logs in controversy. The evidence on the part of the plaintiff on this subject was to the effect that plaintiff and one Harrill made a contract, by the terms of which plaintiff was to furnish the timber, provision the camp, pay the hands and other expenses, and Harrill was to superintend the cutting of the logs and putting them in the river, and was to have the privilege of purchasing them from the plaintiff for fifty cents per thousand feet, and Harrill was to reïmburse the plaintiff for all sums so expended, with ten per cent interest thereon. By the terms of the contract, the logs were to be and remain the property of the plaintiff, and to be in his possesion and under his control until Harrill should buy and pay for them, which he might do at any time before the close of the season for running logs. The evidence further tended to prove that all the logs in controversy were branded "7" and "2," and were cut under this contract partly on the plaintiff's land and partly on the land of E. Banty from timber purchased of him by plaintiff; that the logs were cut by and under the direction of Harrill and one Striker, who was his partner in the logging business, and

who became a partner with Harrill in this contract after the making of the same; that plaintiff furnished all the timber and paid all the expenses for running the camp, cutting and putting in the logs, etc.; that on the fourth day of February, 1890, all the "7" and "2" logs but a few which were in the. Mohawk river and within one and a half miles at the farthest from plaintiff's land, were in the river or banked on plaintiff's land, and all of them were in his possession and owned by him; that there were about six million feet of other logs in the river; that plaintiff's logs were put in the river and were behind all the other logs; that there were fourteen different brands of logs in the river, owned by other parties; that all the brands had been put in indiscriminately and mixed and commingled by common consent of the parties who owned them; that about one-half of the logs in the river had been run by Harrill and Striker to or near the mouth of the Mohawk river, and that they were engaged on those branded "2" and "7," and running them with all the other logs in the river, when on the fourth day of February, 1890, high water carried a great many of the lower logs out of the Mohawk; that on that day, and before the plaintiff's logs had been moved by the high water, Harrill and Striker went to the plaintiff and informed him that owing to their loss at the mouth of the river they would be unable to purchase the 7's and 2's under their contract, and that they would do no more work on that river, and advised the plaintiff to take steps to secure his logs against the high water, which plaintiff did at once attempt to do. But on that night they were carried about four miles down the river with other logs where they were lodged in a jam, in which were lodged in all about four million feet of all the different brands in the river; that the upper part of the jam consisted of about 400,000 feet, nearly all being branded "7" and "2"; that only a part of the "7" and "2" brands got out of the Mo-

hawk, and they were in the McKenzie and Willamette rivers.

The evidence on the part of the plaintiff, and given by the plaintiff on his own behalf, tended to prove that he was the owner and in possession of the land on which the logs were cut, and he claimed to be the owner of the logs because he was the owner of the land and in possession thereof, and because he had made a contract with Harrill and Striker for cutting the logs on the land, and he had never parted with their possession until they were taken by the defendant.

The defendant's exception is that it is not competent to prove title to land by oral evidence; but the exception can not be sustained because the inquiry as to the title to the land is only collateral. It is not the main fact in dispute, and it is only proven as a fact tending to show title in the logs after they were severed from the realty. In this and many other similar cases arising constantly in practice, oral evidence of the fact and of the possession of the realty from which the chattel was severed is received, and rarely objected to. Besides this, the evidence went to the jury without objection, and the exception was to the refusal of the court to withdraw it. But that does not change the force of the objection in this case. We place the decision on the ground that this evidence was competent for the purpose for which it was offered. But the appellant's counsel insist that plaintiff's evidence did not go far enough to establish his possession. It is not perceived how this contention can be sustained. Plaintiff testified that he was in possession of the land and the logs. This presented a question of fact upon which the jury was compelled to pass. The defendant might have pressed the inquiry further and ascertained in what manner the plaintiff was in possession, that is, whether he was actually in possession by occupying the land, or whether it was such possession as the law declares follows the legal title; but this he

did not do, and this court is unable to indulge in any conjectures on the subject in the present condition of the record before us. There was evidence on the point which was competent, and that is sufficient.

The plaintiff's counsel asked him: "How many of the figure '7' were put into the river?" To which the defendant objected but the objection was not allowed, and an exception taken, and the witness answered, "About 836,000 feet." The same question was asked about the 2's, with the same objection and exception, and the witness answered: "About 700,000 feet." There was a dispute as to the quantity of logs the plaintiff had in the river and the quantity of plaintiff's logs that came into defendant's possession; and we think this evidence relevant and competent on those questions. The same may be said as to the question asked Oscar Parsons as to the number of logs, 2's and 7's, put in the Mohawk river when the defendant took them. This evidence was not direct and probably not satisfactory in itself, but it contained some facts which would necessarily enter into the deliberations of the jury, and could be used by them in connection with the other evidence in the case in computing the plaintiff's interest in the jam and the proportion of the 2's and 7's taken by the defendant.

The plaintiff's counsel asked him: "Did you get any money from any body to run the camp?" Also the following: "Now, are there any expenses for putting in those logs that have not been paid yet?" Each of these questions was objected to; and the objections being overruled, an exception was taken, and the witness answered each question affirmatively. The facts sought to be elicted by these questions have no direct bearing upon the questions at issue; but the questions were evidently asked for the purpose of amplifying the facts already in evidence by the plaintiff without objection; that his contract with Harrill obliged him to advance the money to pay the expenses

of running the logging camp and for putting the logs into the river. This evidence was intended to show more specifically and with greater particularity the fact that the plaintiff did perform this part of his agreement with Harrill. Inasmuch as the defendant claims title to the logs through Harrill and Striker, it became necessary for the plaintiff to prove what contract he had with them, for the purpose of showing to the jury that they had derived no title to the logs through him. In this way the plaintiff might get some immaterial evidence before the jury, because it was so connected with other questions that were material that they could not be separated, but such evidence could do the defendant no injury, and it would be a refinement of technicality not to be thought of to reverse a judgment upon such an exception.

The plaintiff's counsel asked the witness Oscar Parsons the following question: "From what you saw in your trips down the river, how many of those logs, figures "2" and "7," went to Corvallis and Harrisburg?" This question was objected to; and the same being overruled, an exception was taken, and the witness answered, "About one million feet." This question was asked on re-direct examination. The witness had previously testified, without objection, that he was a logger; had logged seven years on the Mohawk river; that he had helped run all the logs in the Mohawk for Harrill and Striker, and was their foreman, and knew the exact location of all the logs after the flood, and when the defendant took them; that the defendant took all the logs left in the Mohawk river after the flood that could be gotten out and driven down; that the defendant made two drives and cleared them all up that he could get; that witness worked for the defendant on both of these drives; helped break the jam and run the logs to Coburg, Harrisburg, and Corvallis, where the defendant used or sold them. All the fourteen brands in the river were put in and run indiscriminately, no effort being made

to separate them.   They were all being run by Harrill and Striker when the flood came, and were mingled together by them.   In view of this evidence the plaintiff was properly allowed the answer to the question under consideration. The material issue was the quantity of these logs used by the defendant, and this question and answer, when taken in connection with the preceding part of the evidence of this witness, had a direct bearing upon that question.

On the cross-examination of this witness, the defendant's counsel asked him this question:  "What would be the value of the logs, 2's and 7's, if you were to buy them as they were in these jams at the time the defendant took them and take them mixed up with the other logs of the defendant's there, without the right, in running them, to interfere with the defendant's logs or to run them altogether otherwise than at the owner's expense?"   This question was objected to by the plaintiff, which objection was sustained by the court and an exception taken.   The defendant's counsel stated to the court that he expected the witness to answer that these logs, 7's and 2's, would not be worth anything if taken mixed up with those other logs, for the reason that to separate them and run them separately would cost more than the logs were worth, and for the reason that to run so many of the other brands as would be necessary to cause a separation of the 7's and 2's from them, or to run them together at the purchaser's own expense, would also cost more than they were worth.   The question is unnecessarily prolix and its meaning is not obvious, and the facts which counsel expected to elicit by the answer consist almost entirely of an argument, the obvious purpose of which was to show that the logs were of no value.   It must be remembered that the evidence in the case tended to show that these logs in the river were mingled together by the owners of the various brands by mutual consent.   It does not appear to us under such circumstances if the expense of separating was so great in

that small river, or in the jam where they were lodged, that any one or more of such owners was bound to separate his logs from the others before proceeding to run his own logs.   There was no market there for the logs, and it probably was impossible to separate them in such a small stream; but if they could not be separated there they could be driven down the stream to some point where separation was possible and convenient; and if that was the cheapest and best mode of doing it, then any one or more owners of the logs, upon notice to the other owners, had the right to pursue that course with them and to compel all the other owners who did not aid or participate in the run to contribute his proportion of the reasonable expenses of running the same.   This is a necessary incident of the consent to mingle together, and each owner must be held to have impliedly consented to mingle his logs with the others in the river.   This must be so, or else one contrary owner has it in his power to virtually confiscate all the logs thus mingled by refusing his consent to permit his logs to be driven with the others.   No such consequence as this was intended by any of the common owners, and is not to be gathered either from their acts or words.   The same reasoning is applicable to the other question asked Oscar Parsons. The defendant also contends that these questions and the answers expected presented a question as to the correct measure of damages, but that question will be considered in connection with the court's charge on that subject.

On the subject of the measure of damages, the court instructed the jury as follows:  "And then you must find out what those logs were worth, when and where the defendant took them, if he took them.   There is testimony tending to show that he took them up the Mohawk river.   There is some evidence tending to show what the logs were worth at the mouth of the Mohawk river (that kind, character and quality of logs), and that too when the logs were away from the market some distance.   You will find from the evidence

the market value at the nearest market, the nearest convenient market, and then you will find from the evidence what it cost to take the logs from where they were to that place, and deduct that from the value of the logs at that place; and when you have found that, that is the amount you are to find for the plaintiff." On the same subject the defendant requested the following instruction: "You will then ascertain from the evidence the value of the number of these logs which defendant took and converted, and in estimating that value you will find what those logs would sell for as they were in the condition and at the time in which the defendant took them, mixed up there as they were with all the other logs, and the purchaser to take his chances of getting them out of there at his own costs, and of getting any pay from the owners of the other logs for any work done on those other logs, except what the owners of those other logs might agree to pay the purchaser therefor."

There are some discrepancies in the authorities as to what is the measure of damages in an action of trover, though the general rule undoubtedly is the value of the property at the time the same was converted, with interest from the time of such conversion. The defendant seems to concede this to be the correct rule, but his contention is as to the time and place of conversion, and much of his evidence upon the trial was directed to the condition of the logs as they were in Mohawk river; but we have already held that any one of the owners of these logs might move them down the river to some place where they could be conveniently separated, and that by so doing he committed no wrong. It would result from this, therefore, that the defendant's acts in moving the logs down the river to a point where they could have been easily separated, was the exercise of a rightful dominion over them and not a wrong of which the plaintiff could complain.

The defendant's acts only became wrongful when he carried the logs beyond that place. But in addition to this it appears there was no market for logs in Mohawk river in the condition these were in. In such case their value would be determined by the nearest and most convenient market, deducting the cost of their transportation and delivery at that place. The justice of this principle commends it to our favorable consideration, and the right to deduct the expense was practically applied in *McLean Co. Coal Co.* v. *Long,* 81 Ill. 350; *Hill* v. *Canfield,* 56 Pa. St. 454.

Finding no error in the judgment appealed from, the same must be affirmed.